PORT HURON MACHINERY COMPANY, Appellee, v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

**CARRIERS:** Carriage of Goods—Nonconversion by Permitting Trial. A carrier is not guilty of converting a shipment by permitting the purchaser, without even the production of a bill of lading, to have the temporary possession and use of the shipment for the purpose of inspection and trial, when such right of inspection and trial was expressly or impliedly contemplated by the consignor and consignee.

**PRINCIPAL AND AGENT:** The Relation—Corrupting Agent for Other Party. A vendor of an article who, surreptitiously and without the knowledge of the vendee, promises to pay the *vendee's* agent a commission if the said agent will "put the deal through and effect the sale," thereby constitutes vendee's agent *his own agent*, and is bound by the acts, conduct, and agreement of his purloined agent in reference to the inspection and trial of the article prior to final acceptance.

**CARRIERS:** Carriage of Goods—Acquiescence of Consignor in Inspection and Trial—Effect. A vendor shipper who has acquiesced in

and ratified the acts of a vendee in inspecting and testing an article shipped, may not maintain an action against the carrier for conversion for permitting such inspection and test, it appearing that the article was promptly returned to the carrier and held subject to the order of the vendor.

Headnote 1:  10 C. J. p. 274 (1926 Anno.)  Headnote 2:  2 C. J. p. 838.  Headnote 3:  10 C. J. p. 274 (1926 Anno.)

*Appeal from Polk District Court.*—O. S. FRANKLIN, Judge.

JANUARY 20, 1925.

ACTION at law for damages for conversion of a second-hand traction engine. The plaintiff, as shipper, had delivered the same to the defendant carrier for shipment. It was shipped under a bill of lading, wherein the plaintiff was named both as consignor and consignee. The bill of lading was sent to a bank, with directions to collect $1,200 thereon before delivery. The shipping point was Des Moines, and the destination point a small station, Kennedy, on the defendant's line. The bill of lading was sent to a bank at Adel, some miles distant from Kennedy. The consignment was intended for delivery to certain purchasers at Kennedy. Immediately upon the arrival of the shipment at the destination point, the intended purchasers took immediate possession, for the purpose of making a trial of the engine in its work. This was done without presenting any bill of lading, and without the actual knowledge of the depot agent. The trial proving unsatisfactory, the engine was immediately returned to the defendant company. The intended purchasers thereafter declined to accept the engine as a compliance with their contract, and declined to take up the bill of lading. The defendant pleaded a general denial and certain affirmative defenses. There was a trial to a jury, and a verdict and judgment for the plaintiff for $800. The defendant has appealed.— *Reversed.*

*Hughes, Taylor & O'Brien,* for appellant.

*W. Chester Strock* and *Paul H. Cunningham,* for appellee.

Evans, J.—I.   The affirmative defenses pleaded were:

(1)   That, under the contract of sale, pursuant to which the shipment was made, the purchasers had the right to make trial of the engine; that, pursuant to such contract, they took immediate possession of the engine, for the purpose only of making such trial; that, immediately after making such trial, they returned the engine to the place from which they took it; and that the same has been at all times in the possession of the defendant, and subject to the demand of the plaintiff.

(2)   That the taking of the temporary possession of said engine for the purpose of trial was done and directed by the plaintiff's own agent, one Hollinberger.

(3)   That the inspection and trial conducted by the purchasers were acquiesced in and ratified, at the time thereof, by the plaintiff.

The court instructed the jury, in substance, that the defendant was liable for a conversion unless the defendant had proved the first affirmative defense herein set out.   The defendant complains of the failure of the court to submit to the jury its other pleaded defenses.   It complains also that the verdict was contrary to the evidence, and that a verdict should have been directed in its own behalf.   Certain rulings upon offers of testimony are also challenged.

The law of liability of a common carrier, so far as it is involved upon this record, is well settled.   For the purpose of the discussion, we shall assume that the bill of lading made a prima-facie case for the plaintiff.   If there is a defect in plaintiff's case in that respect, it is that it never presented its bill of lading, and never made any demand upon the railroad company for its consignment.   Nor does it affirmatively appear that the defendant company had disabled itself from immediate compliance with the demand, if one had been made.   That possible infirmity in plaintiff's prima-facie case we ignore.

1. CARRIERS: carriage of goods: nonconversion by permitting trial.

The bill of lading carries the legal title to the consignment. Delivery of the consignment to a nonholder of the bill of lading is made at the peril of the carrier.   In such event the burden is cast upon the carrier to show that the delivery was made to a person authorized to receive it, notwithstanding the absence of

the bill of lading. The method adopted by the plaintiff amounted, in legal effect, to a consignment C. O. D. Such consignment does not necessarily forbid an inspection and trial. If the consignee or person from whom collection of the price was to be made, was entitled to an inspection and trial before acceptance, the carrier may permit such inspection and trial, without being chargeable with conversion. And this is so, even though it permit the temporary use and *possession* of the consignment, for the purpose only of such trial. Such permission is not, of itself, deemed a delivery or a misdelivery.

If, in this case, the purchasers were in fact, under their contract, entitled to a trial inspection of this engine, such fact is available to the defendant, as a complete defense against the charge of conversion. *Clark v. American Exp. Co.*, 130 Iowa 254; *Famous Mfg. Co. v. Chicago & N. W. R. Co.*, 166 Iowa 361; *First Nat. Bank of Wadena v. Farmers Bank of Traer*, 195 Iowa 1260. This is not a case where the shipment was lost, or where any actual damage resulted thereto, as a result of the inspection. The trial court instructed the jury that, if the purchasers, under their agreement, had a right to make the inspection by trying the engine, then the plaintiff could not recover. The verdict for the plaintiff, therefore, was necessarily a finding that they had no such right. The three affirmative defenses above stated are so blended and so related in the record that it is quite impossible to give a fair consideration to any one of them if the others be ignored. The first question confronting us is whether the verdict is contrary to the evidence on the question of right of inspection. We have read the evidence verbatim, and cannot avoid the conclusion that the verdict is contrary thereto, and purely arbitrary. Upon the controlling feature of the case, the evidence is without material dispute.

II. The antecedent negotiations were had in Des Moines, with the general manager of the plaintiff. He was the chief witness for the plaintiff on the trial, and testified with commendable candor. The one point of dispute between him and the chief witness for the defendant is not controlling, because of other undisputed features of the record.

For the defendant, it appears in evidence that, for some

years, a group of a half dozen farmers in Dallas County had
owned and used jointly, a threshing machine separator. They
owned no engine. They had uniformly employed Hollinberger,
the owner of an engine, to operate for them their separator
during the threshing season. At the beginning of the threshing
season of 1922, Hollinberger's engine failed, and it became
necessary to procure another engine. They deemed it expe-
dient to buy, if possible, a suitable secondhand engine. They
commissioned Hollinberger, who was an experienced engineer,
to go to Des Moines, and see what could be obtained. Hollin-
berger entered into negotiations with the plaintiff at Des Moines
for the engine which was afterwards shipped. These negotia-
tions extended over a period of two, perhaps three, days. Some
members of the purchasing group were present in Des Moines
with Hollinberger, and saw the engine and participated to some
slight extent in the negotiations. The price made by the plain-
tiff was then $1,300. An offer of $1,000 was made, which
was not accepted. The final negotiations and agreement,
pursuant to which the shipment was made, were had between
the general manager of the plaintiff and Hollinberger alone.
The former testified that there was no agreement for the privi-
lege of inspection or trial. The latter testified that there was
such an agreement. The purchasing group had no personal
knowledge of the agreement, except as it was communicated to
them by Hollinberger.

The fatal infirmity in the plaintiff's case appears in cer-
tain candid testimony on the part of the general manager. This
was that he commissioned Hollinberger to "put the deal
through" and to make the sale, and agreed to
pay him a commission of $100 therefor. He
testified:

2. Principal and
agent: the re-
lation: corrupt-
ing agent for
other party.

"* * * The closing of the deal was made
with Hollinberger, and was not made with the other men at all.
The other men were not present when the deal was closed. I
agreed to give Mr. Hollinberger a commission if the deal went
through. I don't remember definitely whether it was $75 or
$100, but I agreed to give him some commission if he put the
deal through. I closed the deal with Hollinberger, and not with
the farmers. I don't know what deal he made with the farm-

ers; *but he made the deal with the farmers,* and I agreed to pay him a commission if he *finally made a sale.*"

Disregarding the sinister aspect of such agreed commission and its invasion of the hearthstone of the purchasing group, it created a situation and a relation which should not have been ignored upon the trial below. By such arrangement the plaintiff made Hollinberger its own agent for the purpose of making the sale, and became bound by his subsequent conduct and representation, within the scope of such agency. It could not take the benefit of such an agency and escape the burden of responsibility therefor. By such arrangement, also, it destroyed Hollinberger's agency for the purchasing group, so far as its own right to rely on such agency was concerned. The members of the group knew nothing about the changed relation of Hollinberger to the subject-matter of the negotiations. Plaintiff could not thereafter bind the purchasing group by mere negotiations between its general manager and Hollinberger.

The foregoing is the final agreement, pursuant to which shipment was made. The purchasers were under the pressure of great hurry to get into their fields. The shipment was made at once on Friday, August 3d, and reached its destination, 25 or 30 miles distant, the same day. Hollinberger and one of the purchasing group boarded the flat car upon which the engine was shipped, and fired it en route, in order that it might be ready for unloading under its own power, immediately upon arrival. The other members of the purchasing group were at the station waiting for it, and ready to assist in the unloading. None of them knew that the bill of lading had been sent to the Adel Bank, some miles distant. The car was spotted about 12 rods from the station. The engine was unloaded therefrom and taken to the field where the separator was stationed. On Saturday, a trial was had, which proved very unsatisfactory. On Sunday, Hollinberger and two or three of the purchasing group hastened to Des Moines, with their complaint of trouble. In response thereto, Diebel, the Des Moines salesman, who had steamed and exhibited the engine at Des Moines, and who had loaded and billed the same, came to the assistance of the purchasers. One of the defects was a broken clutch. Diebel testi-

fied that this break had occurred in Des Moines, before ship-
ment. Other defects were in the smokestack and in the flues.
Diebel returned to Des Moines on Monday night, promising to
return on the following day with the proper repairs. He came
on the following day, bringing with him repairs for the clutch,
and a smokestack. The repairs were placed upon the clutch.
Whether the smokestack was installed, does not appear. At the
time of his making such repairs, Diebel knew that the bill of
lading was outstanding and uncollected. Likewise, the general
manager knew the same thing. The members of the purchasing
group acted in good faith, believing that they had a right to
make such trial. Diebel and the general manager necessarily
knew at the time that they did so believe. There is no room,
upon the record, to doubt that Hollinberger believed the same
thing. Diebel returned to Des Moines on Tuesday evening. On
Wednesday morning, the engine was returned to the railroad
station by Hollinberger and the purchasing group, and was re-
jected as not satisfactory. It has at all times remained in the
possession of the railway company, subject to the demand of
the plaintiff.

Such are the undisputed facts appearing in this record.
One feature of the case which was ignored in the court below
was the conversion by plaintiff to its own use of the agent of
the purchasing group. The creation of this agency by plaintiff
carries a double aspect:

(1) Because thereof, the right of the purchasing group
to make inspection must be determined by their conversation
with Hollinberger after he became agent for the plaintiff, and
not from the conversation of Hollinberger with the general
manager.

(2) Hollinberger was the directing hand and mind that
took the engine from the station to the field, for the purpose of
trial. In so doing, he was acting within the scope of the agency
conferred upon him to "put the deal through" and to "make
the sale." His act in so doing was, of legal necessity, the act
of the plaintiff itself.

III. Furthermore, the subsequent conduct of all parties
was wholly inconsistent with the theory that there was to be
no right of inspection by trial, but was acquiescent and rati-

3. CARRIERS: carriage of goods: acquiescence of consignor in inspection and trial: effect.

fying in its nature. The Des Moines agency knew that the right was being exercised, and acquiesced in it. It knew that the engine had been taken for such purpose, and it participated in the trial of it. The very sending of the bill of lading to Adel, several miles distant, was inconsistent with such theory. Concededly, the engine was shipped hurriedly, in order to meet the necessities of the purchasing group, who needed the engine for immediate use. If it was really to be paid for in advance of any trial thereof, there was no apparent reason why it should not have been paid for in Des Moines, before shipment. The purchasers were there, and accessible. To send the bill of lading to Adel for collection could only work delay and inconvenience, if payment was expected before delivery by the railway company at the station at Kennedy. The very method adopted indicated a purpose to *delay* collection until a fair trial could be had. As between the plaintiff and the defendant carrier, it was the duty of the plaintiff to receive the shipment at the destination point with reasonable promptness. It was likewise its duty to unload the freight and to release the defendant's car with like promptness. Failing to do so, it would become subject to penalties in the form of demurrage. The relation of the defendant to the shipment would change from that of carrier to that of bailee. But the plaintiff made no other provision for the receipt of the freight or the unloading thereof except that which was carried out by Hollinberger. When the engine came to the destination point, Hollinberger was already in possession of it, aboard the flat car. While it was being put upon trial by Hollinberger and the purchasing group, the Des Moines agency participated in the trial for the last two days thereof. During all this time, the bill of lading lay dormant at Adel. The negotiability of the bill of lading is not involved. If the bill had been issued or negotiated to a third party, a different question would be presented. But a bill of lading issued to a consignor and held by him is subject to meritorious defense against him, like any other contract. Suppose that the depot agent of the defendant company had gone to the threshing field on Monday or Tuesday, to enforce his constructive possession and to terminate the temporary use of the engine for trial, and had found there both

the seller and the purchaser, jointly engaged in the trial, would he not have been justified in allowing the trial to proceed? Was his justification any less because he failed to go to the threshing field to observe personally what was going on? The very fact that the plaintiff knew what had been done and what was going on, and yet withheld the presentation of the bill of lading until after the completion of the trial of the engine, was a circumstance of much significance. These facts also have a double aspect:

(1) They bear on the question whether the circumstances appearing in evidence, as distinguished from direct evidence, tend to the support of the verdict or to the contrary.

(2) They bear upon the question of ratification, in that they disclose the acquiescence of the plaintiff, through its Des Moines agency, in the acts of the purchasing group, and a ratification of the acts of Hollinberger in directing such trial, and of the defendant carrier in permitting it. This issue of ratification was not submitted to the jury in the trial below, nor otherwise considered by the court.

We recognize that the defendant's pleading in that regard was not very meritorious. Nevertheless, it did plead ratification in specific terms, and the pleading was in no manner assailed.

Upon a consideration of the record as a whole, we think it is quite conclusive against the plaintiff, and that the defendant's motion, at the close of all the evidence, to direct a verdict, ought to have been sustained. The judgment below is, accordingly, reversed.—*Reversed and remanded.*

FAVILLE, C. J., and STEVENS, DE GRAFF, and VERMILION, JJ., concur.